UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRUCE BACKHAUS,

        Plaintiff,

    v.

                                         Case No. 12-13698

GENERAL MOTORS LLC, f/k/a GENERAL      Honorable Julian Abele Cook, Jr.
MOTORS COMPANY,

        Defendant.

ORDER

      The Plaintiff, Bruce Backhaus, filed this action against the Defendant, General Motors LLC ("GM"), alleging that it had violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and Michigan's Persons With Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1101 ("PWDCRA"). His amended complaint alleges that GM (1) refused to provide him with reasonable employment accommodations, (2) failed to conduct an individualized assessment of his ability to work, (3) improperly restricted him from performing certain jobs, (4) constructively terminated his employment, (5) did not allow him to return to his previous employment, and (6) severely curtailed his disability benefits in an act of retaliation for this lawsuit. Currently before the Court is the GM's motion for summary judgment.

I.

      Since approximately May 6, 1985, Backhaus has worked at various GM plants in a variety of positions, including his service as a forklift driver. He has been legally blind in his left eye since birth.

While working at GM's engine plant in Livonia, Michigan, he - notwithstanding having been declared to be legally blind - applied for a job opening at the Milford plant. He received a response from GM; however, the parties disagree as to whether Backhaus had applied to work as a test track driver or as a fork lift driver. According to GM, Backhaus received an offer to work as a test track driver, subject to certain conditions, including a requirement that he pass the medical exam. According to Backhaus, a number of positions were available, including those of forklift driver and shuttle bus driver. (Backhaus Dep. 98:21, 115:19, Mar. 7, 2013).

Following the customary procedure for all transfers between plants, the physician at the Milford facility, Dr. Rex Brown, reviewed Backhaus' medical records and discovered that he was blind in one eye. It was Dr. Brown's conclusion that Backhaus would not pass the requisite vision test for a test track driver.[1]

As a result of Dr. Brown's conclusion, the Milford offer was rescinded, and Backhaus remained at the Livonia plant. Feeling aggrieved, he filed a discrimination claim with the Equal Employment Opportunity Commission ("EEOC"). The EEOC investigated his claim and notified Backhaus that it did not find a violation of any federal regulation. Rather, the EEOC determined that his transfer had been denied because Backhaus had been offered a test track driver position, which he could not perform safely.

At the same time that he filed his claim with the EEOC, Backhaus also filed a grievance with GM. While his grievance against GM was pending, the Livonia engine plant closed its operations. As a result of the closure, Backhaus accepted a transfer to the GM transmission assembly plant in

---

[1]The vision test for forklift drivers and shuttle bus drivers is the same as the exam for test track drivers.

2

Toledo, Ohio. While at the Toledo plant, he was notified that he (1) had won his grievance, and (2) would be transferred to the GM facility at Milford, Michigan. A letter memorializing the disposition of his case read in part that,

> [t]he grievant will be extended an offer to transfer to the GM Milford Proving Grounds site as soon as practicable following ratification of the 2011 National Agreement, subject to the normal placement process. The parties discussed the fact that the grievant's restrictions may prevent him from performing available jobs, as discussed during bargaining, but GM reiterated its commitment to providing reasonable accommodations.

(Letter to Brian Rivet, Sep. 13, 2011, ECF No. 17-1). Backhaus claims he did not see this letter until after he transferred to Milford. Timothy McNamara, the human resources labor relations manager for Milford, stated that when Backhaus transferred to Milford after winning his grievance, he was only considered for a test track driver position. (McNamara Dep. 12:21, May 21, 2013). The stated reasons for this conclusion were that (1) his new transfer was simply a reinstatement of an original offer in 2009, which was for a test track driver, and (2) no other positions were open at the time. *Id.* at 13. Prior to starting work at the Milford plant, Backhaus participated in the usual hiring process, which included a vision examination. At this time, there was no standard vision test that was enforced by the GM nationwide. (Brown Dep. 37:7, May 21, 2013). Each facility conducted its own examinations by its own standards. *Id.* Thus, an employee, who is cleared to drive at one facility, will not necessarily be cleared to drive at another facility. *Id.* at 38:8. It was the policy of the Milford plant to follow the Department of Transportation ("DOT") regulations for commercial drivers, which requires 20/30 or better vision in each eye on the acuity test and a minimum of seventy degrees on the peripheral vision test. *Id.* at 43:2-10. In addition to the tests required by DOT regulations, the Milford plant also requires a score of at least four out of nine on a depth perception test. *Id.* at 43:13-19. On the acuity test, Backhaus received a score of 20/13 in his right eye and for both eyes together,

3

indicating vision that is better than normal. *Id.* at 44:11-24. However, he scored zero in his left eye, which is the limit of the testing machine and considered legally blind. *Id.* On the peripheral vision test, he scored 85 degrees with his right eye but only 55 degrees with his left eye. *Id.* at 49:10-14. He scored seven out of nine correct answers on the depth perception test. *Id.* at 45:6. As a result of the scores he received with his left eye, he failed the acuity and peripheral vision tests. He passed the depth perception test. Dr. Brown maintains that the vision requirements at the Milford facility are higher than at the other GM plants because the physical layout of the plant makes driving difficult. He insists that the environment at Milford is very different from the environment at other GM plants. *Id.* at 67:25-68:18. The forklift drivers do not operate in an open warehouse with low pedestrian traffic. Rather, "[the] warehouse is lined with . . . racks and narrow aisle ways and people walking around getting parts because the people going to get parts are using these same aisle ways as the [forklift] drivers. Normally in a GM plant, the [forklift] drivers are in one area, they're operating . . . on one side and the people are working on the other side of the rack." *Id.* at 68:21-69:3. According to Dr. Brown, Backhaus' poor visual acuity and depth perception would be a concern in the "dark, dimly-lit aisleways." *Id.* at 55:9.

Notwithstanding Dr. Brown's medical assessment, Backhaus claims that he is able to adequately compensate for his blind left eye by constantly turning his head to make up for his lack of peripheral vision. (Backhaus Dep. 43:13, 44:25-45:3). Backhaus' family physician, Dr. Mary Greiner, wrote the following note which affirmed her patient's ability to compensate for his monocular vision. In part, her note read: "[Backhaus] explains to me that he is a marksman rifle shooter and has long been accomplished at baseball. Due to his mastery of these sports, I have to conclude that he effectively compensates for his monocular vision using other clues to accurately

4

perceive distances." (Pl.'s Resp., Ex. 15, Mary Greiner, D.O. Assessment of Backhaus, ECF No. 20-15).

After receiving the note, Dr. Brown called Dr. Greiner. According to Dr. Brown, after their conversation, Dr. Greiner stated that (1) she could not assess or comment on Backhaus' ability to safely work as a test track driver, and (2) an eye specialist should make that determination. (Clinic Visit Individual Report, ECF No. 17-2).

Passing the vision test is a prerequisite for driving any vehicle at the Milford plant. After Backhaus failed the test, he was not permitted to take a driving test on a forklift. As a result, Dr. Brown placed a no-driving restriction on him. Inasmuch as all of the available positions at the Milford plant required acceptable driving skills, Backhaus was left without a job. According to Joseph Grandberry, a UAW representative whose position at Milford is to find placement for disabled employees, there is no ADA-specific program to handle a situation where an employee is unable to qualify for any positions as a result of a permanent restriction. (Joseph Grandberry Dep. 10:3, May 22, 2013).

Faced with a unique situation, GM decided to place Backhaus in the Accommodating Disabled People in Transition (ADAPT) program. GM chose this route even though ADAPT is not a program for people with permanent restrictions. The ADAPT program had been developed and designed to find short-term positions for hourly employees at the GM who are coming off sick leave with temporary restrictions until the affected employee can return to regular duties. (Martha Arnett Dep. 18:8, May 21, 2013). The program is run by a joint committee composed of one GM

representative and one United Automobile Worker's union ("UAW") representative.[2]

When trying to place Backhaus at the GM plant in Milford, Grandberry and Arnett were limited in their placement opportunities because they were required to honor the no-driving restriction imposed by Dr. Brown. They had initially hoped  to place him in the materials department. (Grandberry Dep. 16:22). However, according to Sheri Rockel, the supervisor of the materials department, there were no jobs that he could safely perform in her department. (*Id.* at 17:1). She reasoned that the materials department was a dangerous environment due to heavy forklift traffic which, in turn, increased the possibility of an injury to an employee. (Grandberry Dep. 17:12). Grandberry and Arnett were ultimately unable to place Backhaus.

After the ADAPT committee determined that Backhaus could not qualify for any positions, he was placed on paid medical leave. He began receiving disability benefits at 60 to 85 percent of his normal pay. (McNamara Dep. 27:8; Backhaus Dep. 136:1). Backhaus, however, expressed a desire to transfer to another GM plant where he could continue to work. He had initially expressed a desire to return to work at the GM plant in Toledo, Ohio.(Backhaus Dep. 124:3).[3]

Backhaus subsequently filed a discrimination charge with the EEOC and the Michigan Department of Civil Rights. On June 20, 2012 he received a "right-to-sue" letter from the EEOC and commenced the present action on August 21, 2012. On March 7, 2013 Backhaus' deposition was

---

[2] In Backhaus' case, the GM representative was Martha Arnett and Joseph Grandberry served as the UAW representative. Arnett stated that (1) ADAPT is not a program for people with permanent restrictions, and (2) Backhaus is the first person who has ever gone through this program with a permanent restriction. (*Id.* at 20:7).

[3] According to GM, Backhaus later decided not to pursue that path, (McNamara Dep. 47:19-48:12).  Backhaus, however, asserted that his proposal to return to Toledo was almost immediately rejected by Arnett.

6

taken, at which time he revealed that he was working part-time for a company called Eco-Physics. Later that month, Arnett contacted Sedgewick, the company that administers the GM's disability benefits program, to notify it that Backhaus was employed part-time and to inquire if an employee is allowed to work part-time and continue to receive benefits. (Pl.'s Resp., Ex. 18, Arnett Email Re: Backhaus Employment). As a result of Sedgewick's investigation into the matter, Backhaus' disability benefits were terminated on May 3, 2013. (Pl.'s Resp., Ex. 19, Termination of Benefits, ECF No. 20-20).  Backhaus then filed a retaliation charge with the EEOC. On June 11, 2013 he received his "right-to-sue" letter from the EEOC and on July 25, 2013 he amended his complaint to add a claim of retaliation. On October 18, 2013, GM filed this motion to dismiss all claims.

## II.

The purpose of the summary judgment rule, as reflected by Federal Rule of Civil Procedure 56, "is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The entry of a summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties." *Aqua Grp., LLC v. Fed. Ins. Co.*, 620 F. Supp. 2d 816, 819 (E.D. Mich. 2009) (citing *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). In order for a dispute to be genuine, it must contain evidence upon which a trier of the facts could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004). When assessing a request for the entry of a summary judgment, a court "must view the facts and all inferences to be

drawn therefrom in the light most favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The entry of a summary judgment is appropriate only if the nonmoving party fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Thus, the moving party has the initial obligation of identifying those portions of the record that demonstrate the absence of any genuine issue of a material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must "come forward with some probative evidence to support its claim and make it necessary to resolve the differences at trial." *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *see also Anderson*, 477 U.S. at 256. The presence or the absence of a genuinely disputed material fact must be established by (1) a specific reference to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or (2) a "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

III.

Backhaus claims that the GM discriminated against him because of his disability in violation of the ADA and the PWDCRA[4] by (1) failing to conduct an individualized inquiry into his ability

---

[4]The parties agree that the PWDCRA "substantially mirrors" the ADA and therefore the same analysis applies. *Chavez v. Waterford Sch. Dist.,* 720 F. Supp.2d 845, 854 (E.D. Mich. 2010); *See also Steward v. New Chrysler*, 415 F. App'x 632, 641 (6th Cir. 2011) ("The PWDRCA 'substantially mirrors' the ADA and claims under both are generally analyzed identically.").

8

to work, (2) refusing to provide him with reasonable accommodations, and (3) terminating his disability benefits in retaliation for filing the present suit. GM contends that Backhaus cannot establish a prima facie case of disability discrimination because (1) he was not "otherwise qualified" for the job, (2) he posed a "direct threat" to the health and safety of others, and (3) he had been adequately accommodated. It is also GM's position that Backhaus' retaliation claim must fail because (1) it was a third-party administrator who made the adverse decision - not GM, and (2) there is no evidence that the proffered reason for the termination of Backhaus' benefits was pretextual.

In order to establish a prima facie case of discrimination under the ADA, Backhaus must show that "(1) he has a disability; (2) he is 'otherwise qualified' for the job; and (3) [GM] . . . failed to make reasonable accommodations." *Denczak v. Ford Motor Co.,* 215 F. App'x 442, 444 (6th Cir. 2007) (citation omitted). If a prima facie discrimination case is established, the burden then shifts to the employer to put forth a non-discriminatory reason for the employment decision. *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 779 (6th Cir. 1998) (citation omitted). If the employer provides what appears to be a genuine non-discriminatory rationale for the employment decision, the burden shifts back to the employee to prove that the offered rationale is pretextual. *Id.* GM does not dispute that Backhaus' partial blindness qualifies him as a disabled person under the ADA and, thus, satisfies the first element of a prima facie case of discrimination. Rather, the dispute in this case turns on the second and third elements.

## A. Otherwise Qualified

An individual is considered "otherwise qualified" for a position if he can perform the essential functions of the job in question, with or without accommodations. 42 U.S.C. § 12111(8). A function is defined as essential if "(1) the position exists to perform the function, (2) a limited

number of employees are available [who] can perform it, or (3) it is highly specialized." *Rorrer v. City of Stow,* 743 F.3d 1025, 1039 (6th Cir. 2014) (citing 29 C.F.R. § 1630.2(o)). Consideration should be given to the employer's determination as to which functions are essential, as well as to the employer's written description of the job. *Id.*; 42 U.S.C. § 12111(8). Courts are also encouraged to consider four additional factors; to wit, (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the work experience of past incumbents of the position, and (4) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3); *Rorrer,* 743 F.3d at 1039; *see also Keith v. County of Oakland,* 703 F.3d 918, 926 (6th Cir. 2013). Under the ADA, employers are required to conduct an individualized assessment to determine if a disability disqualifies an employee from performing a particular job. *Holiday v. City of Chattanooga,* 206 F.3d 637, 643 (6th Cir. 2000).

Here, GM submits that Backhaus was not otherwise qualified to safely work as a test track driver or a forklift driver. Test track drivers spend the vast majority of working hours driving vehicles on a multi-lane test track in varying conditions at speeds reaching up to 100 miles per hour. GM maintains that Backhaus' vision precluded him from safely performing the essential functions of the job, which included driving at high speeds, maneuvering in difficult conditions, and making multiple lane changes with other drivers on the track. In his response, Backhaus does not contest that he was qualified for the test track driver position. However, he maintains that he is qualified to work as a forklift or shuttle bus driver.

### 1. Individualized Inquiry

Backhaus contends that GM violated the ADA by failing to conduct an individualized assessment of his ability to drive a forklift or shuttle bus. Specifically, he contends that GM

10

improperly (1) relied on the medical assessment of its in-house physician, (2) refused his request to demonstrate his driving abilities on a forklift, and (3) imposed a no-driving restriction based on Milford's adherence to Department of Transportation (DOT) regulations, which do not apply to forklift drivers and are not GM-mandated regulations. However, GM maintains that the entry of a summary judgment is appropriate because it conducted an individualized assessment of Backhaus' ability to drive at Milford, which included a personal evaluation by an in-house physician.

"The ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position." *Holiday,* 206 F.3d at 645. Courts are not required to defer to a doctor's opinion that was not based on an individualized inquiry nor supported by objective medical evidence. *Id.* "A proper evaluation involves consideration of the applicant's personal characteristics, his actual medical condition, and the effect, if any, the condition may have on his ability to perform the job in question." *Keith,* 703 F.3d at 923. An employer is not permitted to base its decisions on "stereotypes and generalizations about a disability," but must consider "the actual disability and the effect that disability has on the particular individual's ability to perform the job." *Id.* The past work experiences of the disabled individual must be considered. *See Holiday*, 206 F.3d at 644 (finding question of material fact because plaintiff, seeking job as police officer, had previously served as law enforcement officer and performed every function that defendant's physician insisted plaintiff was unable to perform).

In *Keith,* the court found that the defendant's physician did not perform an individualized inquiry into whether the deaf plaintiff could perform the essential job functions of a lifeguard. The court supported its conclusion with a host of reasons, including the fact that the plaintiff was not allowed "an opportunity to demonstrate his abilities." *Keith,* 703 F.3d at 924. In contrast, the court

11

concluded that the ultimate decision-maker in *Keith* (i.e., the County) did conduct an individualized inquiry because it observed the plaintiff during training and proposed accommodations. *Id.* The court also stated that the ADA was designed to prevent cursory medical examinations based on stereotypical misperceptions instead of actual abilities. *Id.*

On the other hand, the GM points to *Jennings v. Dow Corning Corp.*, No. 12-12227, 2013 WL 1962333, at *10-12 (E.D. Mich. May 10, 2013), wherein the court held that observation of the plaintiff's actual abilities was not required in order to adequately conduct an individualized assessment. In *Jennings,* the plaintiff suffered from chronic back, shoulder, and neck pain. *Id.* at *3. The examining doctor obtained medical records from the plaintiff's treating physicians. These records chronicled the recurring pain and mobility limitations experienced by the plaintiff for at least the preceding six years. *Id.* at *4. The plaintiff's chiropractor noted that the plaintiff's back pain was worsening and exacerbated by relatively light activities such as riding a bicycle or prolonged standing. The plaintiff testified at his deposition that this pain (1) was "ongoing," (2) prevented him from doing strenuous work required by his job, and (3) forced him to take time off. *Id.* The examining physician also reviewed medical questionnaires completed by the plaintiff, and consulted with his assistant, who performed the plaintiff's physical examination. *Id.* at *10. Only then did the doctor make conclusions as to the plaintiff's work restrictions. *Id.* at *11.

Here, Dr. Brown's inquiry more closely resembles the inquiry conducted in *Keith* rather than *Jennings*. There is no evidence that Backhaus' physical limitation prevented him from performing any job functions. Rather, the record indicates that Backhaus has been able to accommodate his monocular vision successfully when driving forklifts. In *Jennings*, the examining physician consulted years of prior medical records which memorialized the plaintiffs own complaints of back

pain, reduced mobility, and physical limitation. In Backhaus' case, Brown imposed the no-driving restriction based solely on the results of the DOT commercial vision test, even though (1) forklift drivers are not governed by DOT standards and (2) GM does not have a standard prohibition against monocular forklift drivers, (Brown Dep., Ex. 4, p. D01906). In fact, according to Mark Pieroni, a GM attorney, "[i]ndividualized determinations or observations are the norm." *Id.* Dr. Brown agrees that drivers with monocular vision learn to compensate. Nevertheless, he based his decision solely on the results of a single test without permitting Backhaus to demonstrate his ability to drive a forklift or shuttle bus in the actual work environment.

Furthermore, the GM asserts that Dr. Stover, a senior GM medical director, conducted an individual assessment of the vision requirements at Milford. However, according to the record, Stover only assessed the vision requirements of a test track driver position. *Id.* There is no evidence that Stover conducted any assessment of the vision requirements to be a forklift driver or shuttle bus driver.

Backhaus' personal physician endorsed his ability to compensate for his monocular vision. Although she retracted this endorsement after speaking with Dr. Brown, she specifically stated that she would defer to an eye specialist. Dr. Brown is not an eye specialist. Brown admitted that (1) further tests could have been conducted to determine whether Backhaus does indeed have some peripheral vision in his eye or depth perception but were not, and (2) a specialist was not consulted.

Finally, Backhaus has past work experience driving forklifts at other GM plants. GM makes much of the fact that Backhaus's forklift license was revoked for unsafe driving at the Livonia plant, but there is no evidence that the incident was due to his vision. Moreover, he retrained for a forklift license and was reinstated within two weeks of the incident. (Backhaus Dep. 81:10). Backhaus's

13

work experience driving forklifts creates a question of fact as to whether he was capable of performing the essential functions of a forklift driver. *See Holiday*, 206 F.3d at 644.

GM contends that it was not required to place Backhaus in a forklift or shuttle driver position because no positions were available at the time. (McNamara Dep. 19:16). However, Grandberry, the UAW representative in the ADAPT program, testified that through the ADAPT program, Backhaus was not limited to positions that were officially listed as available. Rather, the ADAPT committee could pursue job opportunities through informal channels. Grandberry believed that if Backhaus had been allowed to drive a forklift, he could have been placed in a position at Milford. (Grandberry Dep. 19:10). Therefore, whether a position was available is a question of fact for the jury to determine.

Backhaus has produced sufficient evidence that a jury could conclude that GM did not conduct an individualized assessment of his ability to drive a forklift at Milford.

## 2. Direct Threat

A disabled individual is not "otherwise qualified" for a position if he poses a "direct threat" to the health or safety of others that cannot be eliminated by a reasonable accommodation. 42 U.S.C. § 12111(3). There are four factors to be considered in this analysis: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r); *Estate of Mauro v. Borgess Medical Center,* 137 F.3d 398, 402 (6th Cir. 2000). However, an employer can not disqualify an applicant simply because of a slightly increased risk of harm. *Mauro*, 137 F.3d at 403 (citing 29 C.F.R. § 1630.2(r)). The risk must be highly probable and the harm must be substantial. *Id*. Moreover, the risk assessment must be based on  reasonable medical and/or objective evidence. 29

14

C.F.R. § 1630.2(r); *see also Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 14 (6th Cir. 2012) ("Courts are to assess the objective reasonableness of the views of the employer and/or employer's medical professionals who made the direct threat decision.").

Here, GM has simply asserted in a conclusory fashion that Backhaus was a direct threat because of his monocular vision and the layout of the facility. The evidence that Backhaus posed a threat consists of his failed DOT vision test and testimony from GM employees that Milford is "uniquely dangerous." Def. Mot. Summary J. 14.

Backhaus has produced sufficient evidence to create a question of material fact as to whether he posed a direct threat to the safety of others. Although he failed the vision test, the Court cannot say that this fact alone justifies an entry of judgment for GM. Backhaus passed the depth perception test. He also passed the acuity test with both eyes open, which is presumably how he would drive a forklift. He contends that he is able to accommodate for his reduced peripheral vision, and Dr. Brown admits that mirrors would augment his peripheral vision. These factors at least weigh in Backhaus's favor. Perhaps more importantly, Backhaus has successfully driven forklifts in the past without causing accident or injury to himself or others, lowering both the likelihood and imminence of possible harm. There is no evidence that he ever had a driving accident that was caused by his monocular vision. GM makes much of the fact that Backhaus was disciplined for making a turn too fast while driving a forklift at the Livonia plant, but that event was unrelated to his monocular vision. As a question of material fact remains, an entry of a summary judgment on the issue of whether Backhaus posed a direct threat to the safety of others is not appropriate.

## B. Reasonable Accommodation

In order to establish a claim of failure to accommodate, Backhaus must present evidence that

he requested and was denied a reasonable accommodation. *Tubbs v. Formica Corp.,* 107 F. App'x 485, 488 (6th Cir. 2004); *see also Jakubowski v. Christ Hosp., Inc.,* 627 F.3d 195, 202 (6th Cir. 2010). If a disabled employee does not propose an accommodation, the "failure to accommodate" claim must fail. *Kocsis v. Multi-Care Mgmt.,* 97 F.3d 876, 883 (6th Cir. 1996) (affirming summary judgment for defendant because plaintiff "never requested any accommodation from the defendant" and "testified several times that she was physically capable of performing the [job].").

In addition to proposing an accommodation, the accommodation requested must also be reasonable. *Jakubowski*, 627 F.3d at 202. Under the ADA, reasonable accommodations may include:

> making existing facilities used by employees readily accessible to and usable by individuals with disabilities, job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). Although the ADA deems reassignment to a vacant position to be a reasonable accommodation, the ADA does not require an employer "to create new jobs or displace existing employees from their positions in order to accommodate a disabled individual." *Kleiber v. Honda of Am. Mfg.,* 485 F.3d 862, 869 (6th Cir. 2007) (citation omitted); *see also Rorrer*, 743 F.3d at 1040 ("[A]n employer need only reassign the employee to a vacant position.") (quoting *Cassidy v. Detroit Edison Co.,* 138 F.3d 629, 634 (6th Cir. 1998)).

Here, Backhaus bore the initial burden to request a reasonable accommodation. He testified that during the time he was in the ADAPT program he did not believe he needed any accommodation and furthermore, that he could do any job at Milford. (Backhaus Dep. 131:24-132:7). Thus, he did not request an accommodation that would permit him to drive a forklift at

Milford.

Nonetheless, at some point in the process he requested to return to his previous position in Toledo. *Id.* 123:25-124:4. Such a transfer is considered a reasonable accommodation. GM asserts that it explored the option of transfer to Toledo, but the union foreclosed that option. (McNamara Dep.). Backhaus, on the other hand, testified that after he told McNamara that he wanted to return to Toledo, this option was almost immediately rejected by Arnett. (Backhaus Dep. 123:25-124:7). Therefore, there is a question of fact as to whether Backhaus asked for and was denied a transfer.

However, even if Backhaus requested a reasonable accommodation, he is not entitled to the accommodation of his choice. *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996). GM maintains that it properly accommodated him by placing him on paid medical leave. *See Cehrs v. Northeast Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 782-83 (6th Cir. 1998) (no per se rule against a medical leave of absence constituting a reasonable accommodation under appropriate circumstances such an absence can be deemed reasonable); *Black v. Wayne Ctr.*, Nos. 99-1225, 99-1249, 225 F.3d 658 (6th Circuit July 17, 2000) (unpublished) (temporary medical leave for plaintiff to treat multiple sclerosis was reasonable accommodation).

The Court notes that in both cases cited by GM, the medical leave was temporary and specifically requested by the plaintiff. *Cehrs*, 155 F.3d at 782; *Black*, 225 F.3d at 658.  In contrast, Backhaus did not request to be put on medical leave, nor is his partial blindness a condition that can improve with medical treatment. McNamara testified that once an employee is placed on medical leave, he is no longer considered "active," meaning the employee is ineligible for vacant positions that subsequently arise. (McNamara Dep. 17:14-16). Thus not only was the leave in this case involuntary, it was also effectively permanent. As long as he remained on leave, Backhaus received

17

only a fraction of his salary. In consideration of the circumstances in this case, a jury could conclude that involuntary, indefinite medical leave was not a reasonable accommodation under the ADA. *See Kiphart v. Saturn Corp.*, 251 F.3d 573, 587 (6th Cir. 2001) ("[A] reasonable jury could have determined Saturn's policy of placing restricted employees on involuntary medical leave regardless of their ability to continue to perform in temporary positions was unreasonable."). GM's motion for an entry of summary judgment with regard to Backhaus's claim of failure to accommodate is denied.

### C. Retaliation

In order to establish a prima facie case of retaliation under the ADA or the PWDCRA, it is the plaintiff's burden to demonstrate that: (1) he participated in a protected activity, (2) his employer knew of the protected activity, (3) he suffered an adverse employment decision, and (4) there was a causal connection between the protected activity and the adverse employment decision. *MacDonald v. UPS*, 430 F. App'x 453, 463 (6th Cir. 2011); *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 525 (6th Cir. 2006). Once a prima facie case is established, the burden shifts to the defendant to show there was a legitimate, non-discriminatory reason for the adverse employment action. *Choulagh v. Holder*, 528 F. App'x 432, 437 (6th Cir. 2013). If such a reason is offered, the burden shifts back to the plaintiff to show that the reason was pretextual. *Id.* A plaintiff can show pretext by demonstrating that the employer's proffered reason (1) had no basis in fact, (2) did not actually motivate the employer's decision, or (3) was insufficient to motivate the employer's action. *Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 486 (6th Cir. 2010) (citation omitted).

Backhaus contends that in retaliation for pursuing the present lawsuit, GM terminated his disability benefits. GM maintains that Backhaus's retaliation claim must fail because (1) Sedgwick,

18

the third party administrator of GM's disability benefit plan, took the adverse employment action, (2) Backhaus has not proven a causal link between the protected activity and the employment action, and (3) even if Backhaus can make out a prima facie case of retaliation, he has failed to present evidence demonstrating that the non-discriminatory reason for terminating his benefits was pretextual.

GM relies on *Reddy v. JPMorgan Chase Bank, N.A.*, Nos. 2:09-cv-1152, 2:11-cv-879, 2013 WL 3147949 (S.D. Ohio June 19, 2013) to support the notion that an employer must directly take the adverse action in question in order to be liable for retaliation. In *Reddy*, the court stated that because a third party disability benefits administrator, not the employer, made the decision to deny the plaintiff long term disability benefits, "[the employer] took no adverse employment action." *Id.* at *12. The employer in *Reddy,* however, was not involved with the decision. The plaintiff filed for disability directly with the administrator, who denied her claim. *Id.*

Here, although Sedgwick, and not GM, ultimately made the decision to deny benefits to Backhaus, it was Martha Arnett, a GM employee, who informed Backhaus's disability case manager of his employment status. Backhaus relies on the "cat's paw" theory for the proposition that GM's bias may be imputed to Sedgwick because GM's employee intended to cause the termination of Backhaus's benefits when she alerted Sedgwick of his employment. In *Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339, 351 (6th Cir. 2012) (quoting *Staub v. Proctor Hospital,* 131 S. Ct. 1186, 1194 (2011)), the cat's paw theory was defined as a situation in which an employer could be found liable under the ADA for retaliation  if "a supervisor perform[ed] an act motivated by [discriminatory] animus that [was] *intended* by the supervisor to cause an adverse employment action, and that act [was] a proximate cause of the ultimate employment action. . . ."

19

According to *Chattman* however, Backhaus is still required under the cat's paw theory to show that (1) Arnett intended to cause an adverse employment action and (2) Arnett's email was a proximate cause of Sedgwick's ultimate decision to terminate benefits. *Id.* at 351. Backhaus has not provided evidence demonstrating that Arnett intended to cause an adverse employment action nor that the email was the proximate cause of Sedgwick's decision. Arnett's email did not recommend terminating Backhaus's benefits. Instead, she asked if employees on disability were allowed to receive disability benefits while also employed part-time elsewhere. (Pl.'s Resp., Arnett Email, Ex. 18). Furthermore, Sedgwick conducted its own investigation, concluded that Backhaus was employed part-time, and terminated Backhaus's benefits, not because of Arnett's alleged discriminatory animus, but because gainful employment disqualifies a person from receiving disability benefits. (Pl.'s Resp., Termination of Benefits, Ex. 19, ECF No. 20-20).

Backhaus has failed to present sufficient evidence of a causal connection between his protected activity[5] and the adverse employment action. "A causal connection is established by the presentation of evidence 'sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action.'" *Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 105 (6th Cir. 2005) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). Backhaus argues that a causal connection exists based on the fact that his deposition was taken on March 7, 2013 and on March 22, 2013 Arnett sent her email regarding Backhaus's part-time employment. (Pl.'s Resp., Arnett Email, Ex. 18). However, the Sixth Circuit has consistently held that "a prima facie case of retaliation cannot be based on temporal proximity alone." *Choulagh v. Holder,* 528 F. App'x 432,

---

[5]It is unclear if Backhaus claims that the protected activity is filing the present lawsuit or testifying at his deposition. In either case, however, he is unable to support establish his retaliation claim.

439 (6th Cir. 2013); *see also Sosby v. Miller Brewing Co.,* 211 F. App'x 382, 387 (6th Cir. 2006) ("[the plaintiff] presented no precedent where a court in this circuit found temporal proximity alone sufficient to satisfy this element").

Even were the Court to assume that Backhaus established a prima facie retaliation claim, GM satisfied its burden of providing a legitimate, non-discriminatory reason for notifying the benefits center of Backhaus's employment. First, Arnett testified that it was part of the natural process of an ADAPT representative to report things of that nature to the benefits center. (Arnett Dep. 57:1). There is no evidence that GM permitted other similarly situated employees to receive benefits while working. In fact, the record suggests that on two or three prior occasions Arnett reported to the disability administrator that an employee on disability had found other employment. (Arnett Dep. 68:10). Second, the actual reason for the termination of benefits was that Backhaus's part-time employment made him ineligible to receive disability benefits. (Pl. Response, Ex. 19, Termination of Benefits, ECF No. 20-20). According to the Extended Disability Benefits provisions of the GM Life and Disability Benefits Program, an employee must be totally disabled to receive benefits. *Id.* To be considered totally disabled, an employee must not be employed for remuneration or profit. *Id.* Sedgwick conducted an investigation into Backhaus's employment and discovered that he was gainfully employed by Eco-Physics. *Id.* As a result, Sedgwick concluded Backhaus was not totally disabled and therefore not eligible for disability benefits. *Id.*

It is Backhaus's burden to show that the non-discriminatory reason for the adverse employment action was pretext. He has failed to do so. He has presented no evidence to suggest that (1) ADAPT representatives do not ordinarily inform the benefits center that an employee on disability leave who may be working or (2) a person on leave who works part-time is eligible to

receive disability benefits. Inasmuch as Backhaus has not presented evidence to demonstrate that the non-discriminatory reason for terminating his benefits was pretextual, GM's motion for summary judgment will be granted with respect to the claims of retaliation.

IV.

For the reasons that have been set forth above, GM's motion for summary judgment (ECF No. 17) is granted in part and denied in part. Summary judgment is denied with respect to counts I and II of the amended complaint and granted with respect to counts III and IV.

IT IS SO ORDERED.

Date: September 22, 2014                         s/Julian Abele Cook, Jr.
                                                 JULIAN ABELE COOK, JR.
                                                 U.S. District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 22, 2014.

                                                 s/ Kay Doaks
                                                 Case Manager

22